## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALEX SALAZAR,

      *Plaintiff,*

v.                                            No. CIV 16-00120 RB/KK

ALBUQUERQUE BERNALILLO
COUNTY WATER UTILITY AUTHORITY,

      *Defendant.*

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, filed on October 13, 2016. (Doc. 30.) Jurisdiction arises under 28 U.S.C. §§ 1331 and 1367. Having considered the submissions of counsel and relevant law, the Court will **GRANT** Defendant's motion and **DISMISS** Plaintiff's Complaint.

### I.    Brief Factual/Procedural Background

Plaintiff, Mr. Alex Salazar, was an employee of Defendant Albuquerque Bernalillo County Water Utility Authority (the Water Authority). Plaintiff had been disciplined numerous times for a variety of incidents during his employment with the Water Authority. On July 3, 2014, Plaintiff and Defendant entered into a written contract (the Last Chance Agreement), which laid out the terms under which Plaintiff could continue his employment with Defendant. The Last Chance Agreement specified that if Plaintiff failed to comply with its terms, his employment would be ended as a "voluntary resignation." Defendant learned that Plaintiff had failed to comply with the terms of the Last Chance Agreement and ended Plaintiff's employment in October 2014, as a "disciplinary termination." Plaintiff contends that Defendant's behavior in both disciplining and terminating him was discriminatory on the basis of his national origin and his disabilities in

violation of Title VII of the Civil Rights Act of 1964, the New Mexico Human Rights Act, and the Americans with Disabilities Act. Plaintiff also contends that his termination was a breach of the written contract.

Plaintiff filed his Complaint in the Second Judicial District Court, County of Bernalillo, State of New Mexico, on July 27, 2015, and Defendant removed the case to this Court on February 19, 2016. (*See* Doc. 1 (Compl.).) Discovery ended in September 2016, and Defendant's motion for summary judgment is now fully briefed and ready for decision. (Docs. 13, 30, 31, 33.)

## II.    Legal Standards

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* The moving party bears the initial responsibility of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). The party opposing a motion for summary

judgment "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990) (citing *Celotex*, 477 U.S. at 324). Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The respondent may not simply "rest on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 259; *see also Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.") (quotation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Colony Nat'l Ins. Co. v. Omer*, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)). "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).

### B.     Relevant Local Rules

Pursuant to Local Rule 56, the party moving for summary judgment "must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists." D.N.M. LR-Civ. 56(b). The movant must number the facts "and must refer with particularity to

those portions of the record upon which the movant relies." *Id.* In return, the non-moving party must also provide "a concise statement of the material facts . . . as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed." *Id.* "**All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.**" *Id.* (emphasis added). "The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion." *Id.*

Plaintiff's attorney, Mr. Santiago Juarez, fails to follow Local Rule 56 in the Response. (*See* Doc. 31.) Mr. Juarez's responses to Defendants' facts are comprised more of conclusory, repetitive, argumentative statements than of statements of facts or citations to the record.

### 1.    Plaintiff Fails to Specifically Controvert Facts

Mr. Juarez disputes or "partially disputes" 36 of Defendant's 61 Material Facts. Because it is counsel's job to competently advocate[1] for his client and not the Court's, where Mr. Juarez fails to specifically controvert Defendant's facts, the Court deems those facts undisputed. The Court reviews Mr. Juarez's responses to Defendant's factual recitation below.

### a.    Repetitive Responses

In 22 of the 36 responses to the disputed facts, Mr. Juarez substantially repeats one of four statements:

(1)    Mr. Juarez's first repeated, conclusory statement is about the disciplinary write-ups. "Based on the Exhibit identified herein, Plaintiff states that there are entries that he was not

---

[1] *See* N.M.R. Ann. 16-101 ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.").

aware of. All the Write-ups, except three, were invalid according provisions [sic] of the grievance process in accordance to the Union Contract. They were invalid as they did not adhere to the timeline requirements of the grievance process." (*Id.* ¶¶ 3–5, 8–13 (citing Doc. 31-1).)

The document Mr. Juarez generally cites to is the Collective Bargaining Agreement (CBA) between the Water Authority and AFSCME Local 624. (Doc. 31-1.) He does not, however, identify which write-ups he asserts were invalid or explain how Defendant violated the CBA. Further, he does not establish whether Plaintiff properly disputed any of his alleged grievances within the strictures of the CBA or whether it is proper to raise the issues now in this forum. He does not attach a complete copy of the CBA to his Response, but the Court takes judicial notice of the fact that the CBA is a public record and the full document is available online. *See* CBA at 26, Article 36(I) (Grievance Procedure), available as a PDF at https://abcwua.legistar.com/View.ashx?M=F&ID=2627285&GUID=0D912F65-522F-404A-8DFC-2775DEBFD02C ("Failure to submit a grievance within ten (10) days following the discovery of the act or the condition which gave rise to the grievance, will constitute forfeiture of the right to file.") (last accessed Dec. 31, 2016). Plaintiff has not, therefore, specifically controverted Material Facts Nos. 3–5 and 8–13, and the Court deems them undisputed. D.N.M. LR-Civ. 56.1(b).

(2)    "Due to the selective interpretation and enforcement of the Rules and Regulations by the Water Authority the Plaintiff was wrongfully terminated." (*Id.* ¶¶ 6, 55–58, 60, 61; *see also* ¶¶ 8, 9, 12.) This response is pure argument and does not specifically controvert the facts asserted in these paragraphs. Consequently, the Court deems Defendant's Material Facts Nos. 6, 8–9, 12, 55–58, 60, and 61 undisputed.

5

(3)     "However the Last Chance Agreement was excessively punitive and contrived with intent to terminate Mr. Salazar. The Last Chance Agreement is invalid as it was signed under duress and under threat of immediate termination." (*Id.* ¶¶ 9–13, 21–23.) Again, Mr. Juarez presents argument without referring to the record. He fails to specifically controvert the facts asserted, and the Court deems Defendants Material Facts Nos. 9–13 and 21–23 to be undisputed.

(4)     Plaintiff "was targeted because he had become a liability due to his disabilities." (*See id.* ¶¶ 29, 35, 39, 40.) This argument does not specifically controvert the facts asserted, and the Court finds Defendant's Material Facts Nos. 29, 35, 39, and 40 are undisputed.

### b.     Plaintiff's Exhibits

Even where Mr. Juarez attempts to introduce evidence (*see* Docs. 31-1–31-6), he does not do so in any way that is helpful to his client's position. The Court ruled above that Plaintiff fails to dispute Defendant's factual assertions with his reference to Exhibit 1, the CBA. *See infra* Section II(B)(1)(a). The Court turns to Mr. Juarez's citations to the remaining exhibits.

Exhibit 2 includes three photographs of an unidentified person, presumably a Water Authority employee. (Doc. 31-2.) Mr. Juarez cites to Exhibit 2 in response to Defendant's Material Fact No. 6. (Doc. 31 ¶ 6.) His response, however, is comprised of argument: "The supervisors of the Water Authority are very selective of their interpretation of the regulations of the use of Water Authority vehicles." (*Id.*) This response does not specifically controvert the fact asserted. While the Court will consider the photographs in its analysis of Plaintiff's claims, it finds Defendant's Material Fact No. 6 is undisputed for purposes of this motion.

Mr. Juarez cites to Exhibit 3, an email from Mr. Charles Kolberg noting that Plaintiff's April 2014 automobile accident was not Plaintiff's fault, in response to Defendant's Material Fact No. 27. (Doc. 31 ¶ 27.) It is not clear why Mr. Juarez cites to this email, because it does not

specifically controvert the fact asserted in paragraph 27. (Doc. 30 ¶ 27 ("The Water Authority accommodated Mr. Salazar's inability to drive.").) In his deposition, Plaintiff asserts that the Water Authority revoked his driving privileges after an April 2014 accident that was not his fault. (Doc. 30-C at 40:15–41:25.) Mr. Juarez does not, however, submit any evidence to specifically controvert the substance of the Risk Management Recommendation suspending Plaintiff's driving privileges. (*See* Docs. 30 ¶ 4; 30-B). Regardless, the Risk Management Recommendation suspending Plaintiff's driving privileges occurred in March 2014, prior to the April 2014 accident. (*See* Docs. 30-B; 31-3.) The Court finds Defendant's Material Facts Nos. 4 and 27 to be undisputed.

Mr. Juarez cites to Exhibit 4, July 9, 2014 hospital records related to an episode of heat exhaustion, in response to Defendant's Material Facts Nos. 30–33. (Doc. 31 ¶¶ 30–33.) These facts relate to Plaintiff's allegation that Mr. Mark Kelly discriminated against him because he would not allow Plaintiff to sit in an air-conditioned vehicle on a hot day. (*See* Doc. 30 ¶¶ 30–33.) Plaintiff's response, "Mr. Salazar was taken to Lovelace Medical Center the same day by ambulance suffering from heat exhaustion[,]" does not specifically controvert the facts asserted, and the Court deems Defendant's Material Facts Nos. 30–33 undisputed for purposes of this motion.

Mr. Juarez cites to Exhibit 5, a statement from Mr. Alfred Armijo, in response to Defendant's Material Facts Nos. 50 and 56. (Doc. 31 ¶¶ 50, 56.) Material Fact No. 50 asserts that Plaintiff "admits that he was in the dumpster looking for gold."[2] (Doc. 30 ¶ 50.) Plaintiff's response, which asserts that "[o]ther employees had been seen in the dumpsters by Superintendent, Pat Griego, without repercussion[,]" does not specifically controvert the fact asserted. Material

---

[2] The parties do not offer a detailed explanation of what "dumpster diving" entails. The Court presumes that at some point in the Water Authority's wastewater treatment process, after the solids are separated from the water, there is an opportunity for employees to look through the solids (or "sludge") in either dumpsters or drying beds for valuables.

Fact No. 56 discusses Plaintiff's contention "that another Hispanic employee" has "also engaged in 'dumpster diving . . . .'" (Doc. 30 ¶ 56.) Plaintiff's response, which cites to Exhibit 5 and argues "[t]his is another instance of Disparate Treatment[,]" does not specifically controvert the fact asserted. (Doc. 31 ¶ 56.) While the Court will consider Mr. Armijo's statement in its analysis of Plaintiff's claims, it finds Defendant's Material Facts Nos. 50 and 56 are undisputed.

Mr. Juarez cites to Exhibit 6, a statement from Ms. Judith Galvan, in response to Defendant's Material Fact No. 57. (Doc. 31 ¶ 57.) Again, Plaintiff's response argues "[t]his is another instance of Disparate Treatment . . . ." (*Id.*) While the Court will consider Ms. Galvan's statement in its analysis of Plaintiff's claims, it finds Defendant's Material Fact No. 57 is undisputed.

### c.      Plaintiff's Remaining Responses

Mr. Juarez attempts to dispute several dates and other assertions in Defendant's recitation of the facts, but he fails to point to specific record evidence to support his position. (*See* Doc. 31 ¶¶ 14, 17, 38, 42, 44, 49 52.) Accordingly, the Court finds Defendant's Material Facts Nos. 14, 17, 38, 42, 44, 49, and 52 are undisputed.

A review of the evidence reveals that Defendant's facts could have been disputed, had Mr. Juarez followed the rules. Local Rule 56 is in place "so the Court is not required to conduct a fishing expedition of the record." *Coleman v. Blue Cross Blue Shield of Kan.*, 487 F. Supp. 2d 1225, 1234 (D. Kan. 2007). Admittedly, the Court did engage in a bit of fishing, though its efforts could not save Plaintiff's claims.

### 2.      Plaintiff Fails to Comply with Local Rule 7.4(a)

Mr. Juarez failed to follow another local rule, which mandates that the party responding to a motion must serve and file the response "within fourteen (14) calendar days after service of the

motion." D.N.M. LR-Civ. 7.4(a). Defendant filed the Motion for Summary Judgment on October 13, 2016 (*see* Doc. 30), and Mr. Juarez filed Plaintiff's Response on November 7, 2016 (*see* Doc. 31). To the Court's knowledge, Mr. Juarez neither sought nor was granted an extension to file the response. According to Local Rule 7.1(b), "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b). Despite Mr. Juarez's fatal flaws in failing to comply with Local rules 7.4(a) and 56.1(b), the Court will consider the Response and address the merits of Plaintiff's claims.

### III.    Statement of Facts

####    A.    Plaintiff's Disciplinary History and the "Last Chance Agreement"

Plaintiff, a Hispanic male, has been an employee of the City of Albuquerque since 1999, most recently with the Water Authority from 2010 through 2014. (Compl. ¶¶ 3, 6; Doc. 30-C at 10:10–16; *see also* Doc. 31 ¶¶ 1–2.) Ms. Judy Bentley, Human Resources Director for the Water Authority, stated that "[t]he Water Authority maintains a database of disciplinary actions of all of its employees." (Doc. 30-A ¶¶ 1–2.) Ms. Bentley produced a spreadsheet compiling the Water Authority's disciplinary records concerning Plaintiff. (*Id.* ¶ 3; Doc. 30-A-1.) The spreadsheet lists 30 disciplinary incidents[3] involving Plaintiff during his time at the Water Authority. (Docs. 30-A ¶ 4; 30-A-1.) The Court conducted its own review of the evidence submitted by the parties and found that when specifically questioned about each disciplinary incident during his deposition, Plaintiff denied two and did not recall one of the 30 submitted incidents.[4] (Doc. 30-C at 56:22–

---

[3] Ms. Bentley testified the records showed 31 disciplinary issues on the spreadsheet. (Doc. 30-A ¶ 4.) The Court counts 30 separate entries on the spreadsheet. (Doc. 30-A-1.) The parties do not address this discrepancy. The Court will use 30—the number reflected on the spreadsheet submitted.

[4] Perhaps Plaintiff denied more incidents in other portions of his deposition, but Mr. Juarez failed to submit any pages of the deposition beyond those Defendant provided.

57:25, 186:6–9, 211:15–23; *but see id.* at 46:6–17 (admitting one of those incidents).) Construing the facts in a light most favorable to Plaintiff, the Court will accept 27 of the disciplinary incidents as undisputed fact for purposes of this motion.

Among this list are six undisputed separate disciplinary incidents related to Plaintiff's driving record, including stopping at the side of the road to help someone change a tire, two occurrences of running out of gas, one instance of Plaintiff smoking inside a Water Authority vehicle, and two accidents where Plaintiff was at fault. (*See* Docs. 30-A-1; 30-B.) Plaintiff admits much of the conduct that forms the bases for these disciplinary incidents. (*See* Doc. 30-C at 40:15–41:13 (admitting he had been in "two or three" accidents prior to the one in April 2014), 46:18–50:4 (admitting he helped someone change a tire while in his Water Authority vehicle), 50:5–52:4, 56:19–21 (admitting two occurrences of running out of gas).) Records from the Water Authority reflect that due to Plaintiff's driving disciplinary incidents, and based on a recommendation from the Risk Program Manager, the Water Authority suspended Plaintiff's driving privileges on March 21, 2014. (Doc. 30-B.)

In June 2010, Plaintiff "left his work station to go to the drying beds at [the] far side of the plant . . . to look for gold and jewelry which may be contained in the sludge." (*See* Doc. 30-A-1 at 2.) His conduct violated the Water Authority's rules, and Plaintiff was "verbally coached" because of the incident. (*Id.*) On April 4, 2014, Plaintiff and a co-worker, Mr. Chuck Pacinelli, were together collecting septic samples for the Water Authority. (*Id.* at 5; Doc. 30-C at 11:19–12:11.) They went to the back of a septic site and Plaintiff "decided to get in [a] dumpster [to] look for gold from the trucks . . . ." (Doc. 30-C at 12:12:–14.) Plaintiff's boss, Ms. Jane DeRose-Bamman, caught Plaintiff inside the dumpster "rummaging through the items." (Doc. 30-A-1 at 5; *see also* Doc. 30-A-2 at 2.) Ms. DeRose-Bamman found Mr. Pacinelli "standing on the ledge." (Doc. 30-

A-1 at 5.) Plaintiff admits that only he, and not Mr. Pacinelli, was in the dumpster. (Doc. 30-C at 337:12–338:1; *see also* Doc. 30-A ¶ 9.) Plaintiff "was not disciplined specifically for" the April 2014 "dumpster diving" incident, "but it was part of what led up to the Water Authority's decision to enter into a 'Last Chance Agreement' with" Plaintiff. (Doc. 30-A ¶ 8; *see also* Doc. 30-D.)

"The Water Authority has discretion to use progressive discipline under its Personnel Rules and Regulations, and considers disciplinary histories of employees when deciding what discipline to impose for a particular infraction." (Doc. 30-A ¶ 13.) Shortly after the incident at the dumpster, Defendant drafted a contract entitled "Last Chance Agreement." (Doc. 30-E.) The "Last Chance Agreement represent[ed Plaintiff's] final opportunity to remain employed with the Water Authority." (*Id.* at 1.) The Agreement "outline[d] the Water Authority's expectations and standards regarding improvements to [Plaintiff's] attendance and performance, which [had] consistently been well below standard." (*Id.*) The provisions of the contract required Plaintiff to follow safety procedures, listen to supervisors, comply with the Personnel Rules and Regulations and Code of Conduct, work as scheduled and perform assigned tasks, and follow specific rules regarding leave as outlined in the agreement. (*Id.* at 1–2.) By signing the contract, Plaintiff agreed that if he failed to comply with its provisions or Defendant's Code of Conduct, Defendant could end his employment "as a voluntary resignation without grievance rights." (*Id.* at 3 (emphasis omitted).) The parties signed the Agreement on July 3, 2014. (*Id.* at 3.) Plaintiff asserts that the Last Chance Agreement was "excessively punitive," and he signed it "under duress and under threat of immediate termination." (*See*, *e.g.*, Doc. 31 ¶ 10.)

11

On September 29, 2014, one of Plaintiff's supervisors "discovered that the septage[5] logbook didn't contain critical log entries." (Doc. 30-A-1 at 6; *see also* Docs. 30-C at 112:7–14; 33-1.) Plaintiff admits it was his responsibility to enter information about the "septage protocol samples" into the septage logbook, and he neglected to enter information on 18 samples collected between August 18 and September 29, 2014. (Doc. 30-C at 131:17–133:7, 135:14–136:9.) On October 1, 2014, Plaintiff's supervisor, Mr. Alex Lovato, verified with Plaintiff that he had failed to record information on the samples. (*Id.* at 132:20–133:7.) Plaintiff asserts he forgot to enter the information into the logbook due to "the stress[ ] and being under duress" from signing the Last Chance Agreement. (*Id.* at 133:21–134:1.) Plaintiff also asserts Mr. Lovato should have caught Plaintiff's mistake earlier, as it was Mr. Lovato's habit to check the logbook two to three times each week. (*Id.* at 134:2–24; *see also* Doc. 31 ¶ 19.) Plaintiff admits, however, that he was at fault for failing to log the 18 entries, and Defendant could have terminated him even if Mr. Lovato had caught Plaintiff's mistakes earlier. (Doc. 30-C at 134:2–136:1.)

Defendant drafted a "Notice of Findings & Decisions with Authorization" (Notice of Findings) on October 16, 2014. (*See* Doc. 30-F.) According to the Notice of Findings, Defendant conducted a "Contemplated Action Hearing" on October 7, 2014, "to allow [Plaintiff] and/or [his] representative the opportunity to respond to the allegations stated in the contemplated action hearing notice . . . ." (*Id.* at 1.) The Notice of Findings summarized the details relevant to Plaintiff's failure to log information from August 18 through September 29, 2014. (*See id.*)

Specifically, it stated that "[l]ogging the information from sample collection has been an ongoing practice and is clearly stated in the [Standard Operating Procedures] for monitoring

---

[5] The word "septage" is defined as "the waste or sewage in a septic tank." *Septage Definition*, http://www.dictionary.com/browse/septage (last visited Jan. 12, 2017).

provided to the technicians previously." (*Id.*; Doc. 31 ¶ 16.) It further explained that since May 2014, Plaintiff's "primary duty" was to collect and log four septage samples each week, and "[t]here was no management directed reason for" Plaintiff to stop logging the samples. (Docs. 30-F at 1; 31 ¶¶ 15, 17.) The Notice of Findings goes on to state: "[i]n fact, on September 8th, the Water Quality Lab did not accept three (3) of the samples because they did not meet the temperature criteria and Mr. Lovato recall[ed] specifically reminding [Plaintiff] to enter the information into the logbook for those three (3) samples." (Docs. 30-F at 1; 31 ¶ 17.) "At least one (1) of the samples taken during this time frame violated" an ordinance, "but because the sampling information was not entered into the logbook," Defendant was unable to enforce "any violations for those samples because the documentation [was] not complete." (Docs. 30-F at 1–2; 31 ¶ 18.) Plaintiff asserts that Defendant terminated Plaintiff not only because he failed to log the information, but also because there was a problem with the temperature of the samples. (*See* Docs. 30-C at 162:6–163:11; 31 ¶ 57.)

Defendant ultimately listed seven policies in the Notice of Findings it found Plaintiff had violated and concluded that "[b]ased on all information received, including your prior work history, the determination is as follows: Disciplinary Termination." (Doc. 30-F at 2.) According to a handwritten note on the signature line, Plaintiff "elected not to sign" the document. (*Id.*) On March 8, 2016, Defendant sent Plaintiff a letter amending the Notice of Findings as follows: "Based on all information received, including [Plaintiff's] prior work history, the determination is as follows: [Plaintiff's] employment is ended as a Voluntary Resignation." (Doc. 30-A-3; *see also* Doc. 30-C at 123:11–124:15.) Plaintiff testified that he does not accept the amendment and considers the original wording to have been a breach of contract; in fact, Plaintiff would not have

13

accepted an amendment to the original document if Defendant had fixed it "the minute after they did the initial one . . . ." (Doc. 30-C at 126:1–129:10.)

### B. Disciplinary Incidents and Histories of Other Employees

Plaintiff compares the Water Authority's treatment of him with their treatment of five other individuals: an unidentified person, Mr. Alfred Armijo, Mr. Pacinelli, Ms. Judith Galvan, and Ms. Barbara Gastian. The parties submitted the following information on each of these individuals:

#### 1. An Unidentified Person

Plaintiff submits three photographs of an unidentified person, presumably a Water Authority employee, using what appears to be a Water Authority vehicle to jump start a non-employee vehicle in a parking lot. (Doc. 31-2; *see also* Doc. 33 at 3.)

#### 2. Mr. Armijo

Plaintiff submits an unsworn affidavit from Mr. Armijo, a retired Hispanic Water Authority employee who worked in a different department under a different supervisor. (Doc. 31-5; *see also* Doc. 30-C at 110:5–6, 111:6–22, 114:8–17.) Mr. Armijo stated that his superintendent, Pat Griego, told him he "could look through the [dump container in the back of the plant] for scrap gold . . . ." (Doc. 31-5; *see also* Docs. 30 ¶¶ 8, 56; 31 ¶¶ 8, 56.)

#### 3. Mr. Pacinelli

Mr. Pacinelli, the non-Hispanic employee who was with Plaintiff when he was caught looking for gold in the dumpster, received a "non-disciplinary coaching" for the incident. (Docs. 30-A-2, at 2; 30-C at 246:5–8.) Mr. Pacinelli's disciplinary records show four disciplinary incidents before April 2014, none of which were for looking for gold in either drying beds or dumpsters. (Doc. 30-A ¶¶ 10–11; 30-A-2; *see also* Docs. 30 ¶¶ 52, 54–55; 31 ¶¶ 52, 54–55.)

Plaintiff testified in his deposition that Mr. Pacinelli logged samples with failed temperatures in the logbook at one point.[6] (Doc. 30-C at 166:21–168:13.) Plaintiff also testified about an incident in which Mr. Pacinelli refused to do "the grease traps." (*Id.* at 338:1–339:2.) Plaintiff had to do them for him, and he later got into an accident, for which he was disciplined. (*Id.* at 338:7–24.)

Plaintiff, who was disciplined on two separate occasions for failing to obtain the appropriate certification for his position (Doc. 30-A-1 at 4–5), alleges that Mr. Pacinelli also failed to obtain his own certifications but was not disciplined (Doc. 30-C at 262:5–264:6; *see also* Docs. 30 ¶ 58; 31 ¶ 58). It appears that Plaintiff and Mr. Pacinelli did not share a supervisor at the time of the failed certifications, because they were in separate parts of the Water Authority (*see* Doc. 30-C at 262:5–265:12); but they did share a supervisor—Mr. Steve Garcia—at the time Mr. Pacinelli allegedly refused to do the grease traps (Doc. 30-C at 338:1–339:2).

### 4.    Ms. Judith Galvan

Plaintiff attached an email from Ms. Galvan, a Hispanic employee, to Plaintiff's attorney. (Doc. 31-6; *see also* Doc. 30-C at 162:1–2.) Ms. Galvan asserted that she has "had samples rejected . . . due to not being at proper temperature[,]" and Defendant took "no further action . . . other than" requiring Ms. Galvan "to repeat the process again[,] which is standard." (Doc. 31-G; *see also* Doc. 30-C at 162:3–166:15.)

### 5.    Ms. Barbara Gastian

Plaintiff testified it was his understanding that Ms. "Gastian, division manager for [the] compliance division, . . . was texting on her phone" and got into an automobile accident. (Doc. 30-

---

[6] The samples Plaintiff and Mr. Pacinelli collected were required to be at four degrees or they would "fail." (Doc. 30-C at 38:6–25.)

C at 379:17–19; *see also* Docs. 30 ¶ 59; 31 ¶ 59.) Plaintiff admits, however, he "has no personal knowledge regarding that incident or any disciplinary action or inaction[,]" and he failed to provide any relevant evidence regarding the accident. (Docs. 30-C at 379:20–380:15; 30 ¶ 59; 31 ¶ 59.) The Court finds, therefore, that the circumstances surrounding Ms. Gastian's accident are disputed for purposes of this motion.

### C.    Plaintiff's Allegations of Discrimination and Disparate Treatment[7]

Plaintiff makes general allegations that his supervisors, including at least Ms. Bentley, Mr. Doug Dailey, Ms. DeRose-Bamman, Ms. Gastian, Mr. Mark Kelly, and Mr. Stuart Reeder, discriminated against him from 2006 until he was terminated due to his disabilities and his national origin by giving him excessive "write-ups" (discipline).[8] (*See, e.g.*, Doc. 30-C at 187:8–189:4, 214:21–219:11; 228:6–15, 238:12–239:4, 248:11–18; *see also* Docs. 30 ¶ 34; 31 ¶ 34.) For the most part, Plaintiff "agree[s] with the basis of the write-ups," he simply feels the high number of write-ups is evidence his supervisors were discriminating against him. (Doc. 30-C at 249:3–20; *see also* Docs. 30 ¶¶ 35–36; 31 ¶¶ 35–36.) Plaintiff also alleges Defendant has systematic discriminatory policies, but he cannot specifically identify any such policies. (Doc. 30-C at 298:23–299:24; *see also* Docs. 30 ¶ 61; 31 ¶ 61.) Plaintiff alleges that Defendant "selective[ly] interpret[ed] and enforce[d its] Rules and Regulations . . . ." (*See, e.g.*, Doc. 31 ¶ 61.)

---

[7] At his deposition, Plaintiff made several allegations of discriminatory and disparate treatment from his supervisors. (*See* Doc. 30-C.) The Court will examine Plaintiff's allegations for purposes of this motion, but it does not find that the substance of his allegations are undisputed fact.

[8] Plaintiff mentions no specific incidents involving Ms. Bentley or Ms. Gastian mentioned in the deposition pages Defendant submitted, and Plaintiff submitted no additional testimony or evidence about discriminatory actions by these two supervisors with his own brief and exhibits. (*See* Docs. 30-C; 31.)

1.      **Allegations Specifically Related to Plaintiff's National Origin**

Plaintiff alleges Mr. Kelly harassed and discriminated against him in several ways. First, Plaintiff asserts he was scheduled for a "PFT test" and was required to go in a Water Utility vehicle. (Doc. 30-C at 368:1–369:2 ("I had to go in a Water Authority vehicle. Q. Is that a rule? . . . Did anybody tell you, you can't take your own car? A. No. If I take my own car, I have to clock out.").) Plaintiff alleges Mr. Kelly "didn't want to take me, because—nobody was available to take me because I couldn't drive." (*Id.* at 368:10–13.) When pressed on how Mr. Kelly harassed him, Plaintiff said "[by n]ot taking me to my PFT test. And also getting mad at me [for] canceling my PFT test." (*Id.* at 370:1–4.) Plaintiff asserts Mr. Kelly also discriminated against him by asking Plaintiff what he was doing at his desk without asking the other employees what they were doing,[9] and harassed him by not helping Plaintiff close a manhole, by "mad-dogging" Plaintiff with his eyes, and by speaking rudely to him. (*Id.* at 245:3–24, 370:9–22; *see also* Docs. 30 ¶ 47; 31 ¶ 47.) Plaintiff contends that every write-up Mr. Kelly was involved in, Mr. Kelly was discriminating against him. Plaintiff could not, however, identify any specific write-ups involving Mr. Kelly. (Doc. 30-C at 246:12–247:22; *see also* Docs. 30 ¶¶ 40–41, 45; 31 ¶¶ 40–41, 45.)

2.      **Allegations Specifically Related to Plaintiff's Disabilities**

Plaintiff "claims to have suffered from a number of disabilities during the course of his employment with the Water Authority including a back injury, diabetes, and a shoulder injury." (Docs. 30 ¶ 25; 31 ¶ 25; 30-C at 273:11–274:13; 30-G at 2, Int. No. 4 (listing diabetes and back injury)).) Due to his back and shoulder injuries, Plaintiff could not lift more than 25 pounds, and Defendant accommodated Plaintiff in at least two ways: (1) when Plaintiff was still driving a

---

[9] Two of the three other employees to whom Mr. Kelly did not speak during this incident were also Hispanic. (Doc. 30-C at 245:3–246:11; *see also* Docs. 30 ¶ 46; 31 ¶ 46.)

vehicle, Defendant outfitted his van with a portable hoist that enabled him to lift up manholes (Doc. 30-C at 185:3–14); and (2) after Plaintiff's driving privileges were revoked and he did not have a portable hoist, his supervisor or another employee would open manhole covers for Plaintiff (*id.* at 39:1–25).[10] (*See also* Docs. 30 ¶ 26; 31 ¶ 26.) Defendant accommodated Plaintiff's diabetes disability by giving him Crystal Light instead of Gatorade. (Doc. 30-C at 185:15–25; *see also* Docs. 30 ¶ 28; 31 ¶ 28.)

Plaintiff asserts Mr. Kelly harassed him by asking once or twice a week how his diabetes was doing; as far as Plaintiff knows, Mr. Kelly never asked about anyone else's health. (Doc. 30-C at 388:10–389:5.) Plaintiff alleges that on one occasion, he went to a septic site with Mr. Kelly. (*Id.* at 239:2–11.) Mr. Kelly got out of the van, and Plaintiff asked him to leave the keys in, so Plaintiff could sit in the air-conditioned van while he waited. (*Id.* at 239:11–19.) Mr. Kelly refused and told Plaintiff to roll down the windows, sit under a tree for shade, or go to a nearby building. (*Id.* at 239:15–240:11.) Plaintiff asserts that all three of those suggestions were unacceptable, and he believes Mr. Kelly's refusal to let him sit in the air-conditioned vehicle was discriminatory on the basis of both his disabilities and his national origin. (*Id.* at 239:25–240:4, 241:11–242:3.) Plaintiff alleges that within a day or two of this incident, he went to the emergency room due to heat exhaustion. (*Id.* at 240:13–23; *see also* Doc. 31-4 (July 9, 2014 hospital records); *but see* Doc. 31 ¶ 30 (asserting that he went to the hospital on the day of the incident).) Plaintiff admits he never asked his doctor to write a note saying that he needed to work in an air-conditioned environment; he does not recall if he asked Defendant to accommodate a medical need for air conditioning. (Doc. 30-C at 244:22–245:2, 274:19–275:2; *see also* Docs. 30 ¶¶ 32–33; 31 ¶¶ 32–33.)

---

[10] Defendant asserts that it accommodated Plaintiff's inability to drive. (*See* Docs. 30 ¶ 27; 31 ¶ 27; 33 at 7–8.) It is the Court's understanding, however, that Plaintiff lost the privilege to drive due to his driving record, not due to limitations resulting from any of his disabilities. (*See, e.g.*, Doc. 30-B.)

Plaintiff contends Mr. Dailey discriminated against him in 2007 by giving him "a Notice of Investigation . . . and a Letter of Instruction on [an] unauthorized absence[,]" and for keeping these items in his file past an alleged CBA-mandated six month limit. (Doc. 30-C at 215:13–220:4; *see also* Docs. 30 ¶¶ 38–39; 31 ¶¶ 38–39.) Plaintiff asserts Mr. Reeder discriminated against him on the basis of his disabilities, but again, Plaintiff identifies no specific disciplinary actions. (Doc. 30-C at 188:5–193:1, 207:10–214:10, 227:2–239:1; *see also* Docs. 30 ¶ 37; 31 ¶ 37.) Instead, Plaintiff contends Mr. Reeder discriminated against him when he asked him about Plaintiff's personal truck after he had been in an accident, and because Mr. Reeder said "F you" to Plaintiff and accused him of insubordination. (Doc. 30-C at 192:2–193:24, 204:19–205:22; *see also* Docs. 30 ¶¶ 43–44; 31 ¶¶ 43–44.) Plaintiff believes his supervisors "were getting tired of accommodating [him] for everything, . . . and that's the reason they" gave him "progressive write-ups. What ever they could write-up." (Doc. 30-C at 248:1–9; *see also* Docs. 30 ¶ 29; 31 ¶ 29.)

### D.    Plaintiff's Claimed Damages

Since his termination from the Water Authority, Plaintiff has worked for one employer for a short time, and applied to a second employer but failed to complete the application process. (Doc. 30-C at 318:4–319:12.) Plaintiff worked at Thomas & Betts for four or five days but quit because "it was too much standing" and hard on his back. (*Id.* at 318:4–22; *see also* Docs. 30 ¶ 24; 31 ¶ 24.) Plaintiff did not ask Thomas & Betts for reasonable accommodation. (Doc. 30-C at 318:4:23–25.) Plaintiff applied for a driving job with a taxi company, but he did not complete the process after he discovered he would need a medical card, because he "knew [his] sugars were not good at the time. (*Id.* at 319:1–20; *see also* Docs. 30 ¶ 24; 31 ¶ 24.)

Plaintiff alleges in his Complaint that he "has suffered anger, humiliation, emotional upset, stress, and other and similar emotional and physical symptoms as a result" of Defendant's alleged

harassment and discrimination of Plaintiff. (Compl. ¶ 13.) Plaintiff testified that he has spoken to several people due to the emotional harm he has suffered, including "Julie Bain and her facility,"[11] Dr. Brooks with Presbyterian (most recently around March 2016), a priest at Sacred Heart (in 2013 or 2014, when he was still working with the Water Authority), and individual members of his family. (Doc. 30-C at 296:1–297:18.)

Plaintiff also claims the stress he suffered on the job due to signing the Last Chance Agreement caused his diabetes to go "out of control." (*Id.* at 136:5–9.) Plaintiff asserts he went to an urgent care within that timeframe, and the doctor talked to him about stress. (*Id.* at 137:16–25.) Plaintiff alleges that the reason he ultimately forgot to enter information into the logbook was because of stress. (*Id.* at 133:10–20 ("I was walking into work every day not knowing if I was going to get fired or not get fired.").)

## IV.   Discussion on Counts I and IV: National Origin Discrimination[21]

Plaintiff asserts claims for national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act. (Compl. ¶¶ 15–17, 19–21.) Plaintiff alleges he "suffered disparate treatment," because other non-Hispanic employees who engaged in conduct similar to that of Plaintiff did not receive "the same disciplinary sanctions . . . ." (*Id.* ¶¶ 14, 15, 19.)[22] Plaintiff fails to develop cohesive arguments in his Response and adds little to the Court's understanding of the case, but it appears Plaintiff argues that Defendant discriminated

---

[11] According to Plaintiff's testimony, Julie Bain is a counseling manager for a mental health program connected with Defendant. (*Id.* at 198:1–199:8.) At one point during his career with the City, Plaintiff struggled with drugs and went through counseling with the mental health program. (*Id.* at 198:1–199:13.) It is unclear if Plaintiff spoke to Ms. Bain after earlier drug-related counseling about work or termination-related stress.

[21] Plaintiff's Complaint contains two Count IIIs. (*See* Compl.) The second Count III is a claim for National Origin Discrimination pursuant to the New Mexico Human Rights Act; the Court will refer to it instead as Count IV.

[22] Plaintiff's Complaint is misnumbered. The Court here cites to the first paragraphs 14 and 15.

against him based on his national origin both in its disciplinary actions and in its ultimate termination of Plaintiff.

"To prevail on his claim, plaintiff must establish that his national origin was a determining factor in the challenged decisions." *Zhou v. Pittsburg State Univ.*, 252 F. Supp. 2d 1194, 1215–16 (D. Kan. 2003), (quoting *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996) (internal quotation omitted, alterations in original)), *aff'd sub nom.*, No. 03-3273, 2004 WL 1529252 (10th Cir. July 8, 2004)). "Plaintiff need not show that his national origin was the sole reason for the challenged actions, but he must show that his national origin 'made the difference' in the decisions." *Id.* at 1216 (quoting *Greene*, 98 F.3d at 557 (internal quotations omitted, alterations in original)). "He may meet this burden by direct or circumstantial evidence that his national origin was a determining factor" in the decisions. *Id.* (citations omitted). Without such evidence, he may rely on "the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981)."[23] *Id.*

Plaintiff has not established direct or circumstantial evidence that Defendant's decisions to discipline or terminate him were based on his national origin, thus the Court will evaluate his claims under the *McDonnell Douglas* burden-shifting framework. "A prima facie case of disparate discipline may be established if the plaintiff proves by a preponderance of the evidence that: (1) the plaintiff is a" member of a protected class, "(2) the plaintiff was disciplined by the employer, and (3)" similarly situated employees were treated differently. *Id.* (citation omitted); *see also*

---

[23] The *McDonnell Douglas* burden-shifting framework initially applied only to a claim of refusal to hire; however, courts have applied the framework "to cases involving promotion, discharge, demotion, discipline, layoffs, and other types of employer actions." *Walton v. N.M. State Land Office*, 113 F. Supp. 3d 1178, 1187 (D.N.M. 2015) (quotation omitted).

*Barber v. Lovelace Sandia Health Sys.*, 409 F. Supp. 2d 1313, 1327 (D.N.M. 2005) ("To establish a prima facie claim of disparate treatment based on national origin or color, the plaintiff must show: (i) that he is a member of a protected class; (ii) that he suffered adverse employment action; and (iii) disparate treatment among similarly situated employees.") (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (internal citation omitted)). Similarly, "[t]o establish a prima facie case on a claim of discriminatory discharge, where the plaintiff was discharged for the purported violation of a work rule, the plaintiff must show that (1) he is a member of a protected class, (2) that he was discharged for violating a work rule, and (3) that similarly situated non-minority employees were treated differently." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir. 1997) (citing *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (internal citation omitted)). For purposes of this motion, the Court will accept as true that Plaintiff has established the first two prongs for both his disparate discipline and termination claims.

    **A.**    **Plaintiff fails to establish a prima facie case of national origin discrimination.**

To satisfy the third prong of a prima facie disparate treatment claim, Plaintiff must provide proof that Defendant "treated similarly situated employees more favorably." *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (citation omitted). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Aramburu*, 112 F.3d at 1404 (internal quotation omitted)). The parties disagree on whether Plaintiff has satisfied the third prong. (*See* Docs. 30 at 13–15; 31 at 11–12.) Plaintiff mentions five people Defendant allegedly treated differently than it treated Plaintiff. The Court will examine each person in turn.

### 1.    The Unidentified Person

Plaintiff submits three photographs of an unidentified person who presumably used a Water Authority vehicle to jump start a non-employee vehicle in a parking lot. (Doc. 31-2.) Plaintiff does not identify the name or national origin of the person, who the person's supervisor is, what kind of disciplinary history the person has, or whether the person was disciplined for jump starting the vehicle. (Doc. 31 ¶ 6.) Plaintiff does not meet his burden to show that Defendant treated the person more favorably, because he has not established whether this unidentified person was disciplined or whether the person was similarly situated to Plaintiff. *See Aramburu*, 112 F.3d at 1404.

### 2.    Mr. Armijo

Plaintiff asserts that another Water Authority employee was "caught 'dumpster diving' by Pat Griego, Superintendent, without any repercussions or disciplinary actions." (Doc. 31 ¶¶ 8–9.) Plaintiff submits an unsworn statement from Mr. Armijo, who stated that he was allowed to search in dumpsters by his superintendent, Pat Griego. (*See* Doc. 31-5.) Plaintiff does not clearly connect the statements in the "Material Facts in Dispute" section of his brief to any evidence, but the Court presumes the employee Plaintiff refers to in paragraphs 8–9 is Mr. Armijo.

Plaintiff admits he and Mr. Armijo did not work in the same department or share the same supervisor. (Doc. 30-C at 111:6–22, 114:8–11.) These facts in themselves tend to disprove any assertion that Plaintiff and Mr. Armijo are similarly situated. *See Aramburu*, 112 F.3d at 1404. Moreover, "[t]o establish a prima facie case on a claim of discriminatory discharge," Plaintiff must show "that similarly situated *non-minority* employees were treated differently." *Id.* at 1406 (emphasis added). Mr. Armijo, like Plaintiff, is Hispanic. (Doc. 30-C at 114:116–17.) Plaintiff does not establish through the production of disciplinary records, nor is it clear from Mr. Armijo's statement, what kind of disciplinary history Mr. Armijo had. *See Aramburu*, 112 F.3d at 1404 ("A

court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.") (citations omitted). For the foregoing reasons, Plaintiff fails to establish the third part of the prima facie test under *McDonnell Douglas* with respect to Mr. Armijo.

### 3.   Mr. Pacinelli

Plaintiff fails to present a tenable argument regarding Mr. Pacinelli. From its reading of the briefs and Plaintiff's deposition, the Court has identified four potential arguments regarding Defendant's treatment of Mr. Pacinelli, a non-Hispanic Water Authority employee (Doc. 30-C at 246:5–8).

### a.   Dumpster Diving

Mr. Pacinelli was with Plaintiff when Plaintiff's boss, Ms. DeRose-Bamman,[24] caught Plaintiff looking for gold in a dumpster at a septage site in April 2014. (Doc. 30-C at 11:19–12:16.) Plaintiff admits that only he, and not Mr. Pacinelli, was in the dumpster. (*Id.*at 337:12–338:1; *see also* Doc. 30-A ¶ 9.) Plaintiff "was not disciplined specifically for" this incident, "but it was part of what led up to the Water Authority's decision to enter into a 'Last Chance Agreement' with" Plaintiff. (Docs. 30-A ¶ 8; 30-A-1 at 5.) The Human Resources records reflect that Mr. Pacinelli received a "non-disciplinary coaching" for the incident. (Doc. 30-A-3 at 2.)

Prior to the April 2014 incident, Plaintiff had been "verbally coached" for a similar incident in June 2010, in which Plaintiff "left his work station to go to the drying beds at [the] far side of the plant . . . to look for gold and jewelry which may be contained in the sludge." (*See* Doc. 30-A-

---

[24] The Court was unable to determine from deposition testimony or the parties' briefs whether Plaintiff and Mr. Pacinelli shared a supervisor at the time of this incident.

1 at 2.) Mr. Pacinelli had not been disciplined for looking for gold in either drying beds or dumpsters before April 2014. (Docs. 30-A ¶ 10–11; 30-A-2.) Mr. Pacinelli's disciplinary records show he had been disciplined four times before April 2014. (Doc. 30-A-2.) Plaintiff's disciplinary records show he had 26 undisputed disciplinary incidents prior to April 2014. (Doc. 30-A-1.)

### b.    Tests

Plaintiff alleges Mr. Pacinelli was not disciplined for an alleged failure to obtain certifications. (Doc. 30-C at 262:5–264:6; *see also* Docs. 30 ¶ 58; 31 ¶ 58.) Plaintiff was disciplined on two separate occasions for failing to obtain the appropriate certification for his position. (Doc. 30-A-1 at 4–5.)

### c.    Grease Traps

During his deposition, Plaintiff recounted an incident in which Mr. Pacinelli refused to do "the grease traps." (Doc. 30-C at 338:1–339:2.) Plaintiff alleges that after Mr. Pacinelli refused to do the grease traps, Plaintiff had to do them for him, and he later got into an accident. (*Id.* at 338:7–24.) Plaintiff asserts he "got written up for the accident [he] got into after [he] did the grease traps." (*Id.* at 338:23–24.)

### d.    Water Samples

Plaintiff testified that Mr. Pacinelli did not receive any discipline when he logged water samples with failed temperatures. (*Id.* at 165:21–166:15.) Plaintiff compares this to Defendant's treatment of him after he turned in water samples with failed temperatures: the Notice of Findings related to Plaintiff's termination states that three of the samples Plaintiff collected during the time period he forgot to enter information into the logbook "did not meet the temperature criteria . . . ." (Docs. 30-F at 1.)

25

e.    **Plaintiff fails to show he and Mr. Pacinelli were similarly situated.**

Although Mr. Pacinelli is a non-Hispanic employee who shared a supervisor with Plaintiff at some point in their careers, Plaintiff fails to show they were similarly situated for any of the four incidents he alluded to in either his deposition or his Response. With respect to the incident at the dumpster, the men's conduct was different: Plaintiff was in the dumpster "rummaging through the items," and Mr. Pacinelli was "standing on the ledge." (Doc. 30-A-2 2 at 2.) Because their conduct was different, it is arguable that the work rules they violated were not comparable. *See Aramburu*, 112 F.3d at 1404 ("To assert a claim of disparate treatment, the plaintiff must show that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness.") (citation omitted); *see also Munoz v. W. Res., Inc.*, 225 F. Supp. 2d 1265, 1272 (D. Kan. 2002) (finding plaintiff did not establish prima facie case of disparate treatment where plaintiff "compare[d] his suspension with the less severe punishment received by other employees[,]" but the conduct underlying the punishments was not comparable). Importantly, there is evidence that Plaintiff had previously been disciplined for looking through drying beds for gold (*see* Doc. 30-A-1 (showing 26 undisputed disciplinary incidents prior to the one at the dumpster, including one on June 11, 2010, for looking through drying beds for gold)), whereas Mr. Pacinelli had not received any previous discipline for a similar offense (*see* Doc. 30-A-2 (showing four disciplinary incidents prior to the one at the dumpster)). "Under these circumstances, no reasonable trier of fact could conclude that [Plaintiff and Mr. Pacinelli] were similarly situated." *See Bellairs v. Coors Brewing Co.*, 907 F. Supp. 1448, 1457 (D. Colo. 1995) (finding two employees were not similarly situated where the plaintiff had "an extensive history of discipline problems" and the other employee's conduct was "an isolated incident").

Plaintiff fails to mention the licensing or "grease trap" incidents in his Response or explain how either demonstrate discriminatory treatment. (*See* Doc. 31.) Regarding the licenses, Plaintiff admits he and Mr. Pacinelli worked on different sides of the Water Authority at the time, and the licenses they were trying to obtain were not comparable. (Doc. 30-C at 263:16–25, 264:1–25.) With respect to the grease trap incident, the conduct he is comparing—refusing to do grease traps and getting into an accident—is unrelated. (*Id.* at 338:1–339:2.) Accordingly, Plaintiff fails to establish that he and Mr. Pacinelli were similarly situated for either the licensing or grease trap incidents.

Despite the fact that Plaintiff mentions disparate treatment with respect to the water samples with failed temperatures in his Response (*see* Doc. 31 ¶ 57), he does not bother to explain how Plaintiff and Mr. Pacinelli were similarly situated (*see id.* at 11). Plaintiff not only had failed temperatures, he also forgot to enter information into the logbook. (*See* Doc. 30-F at 1.) Plaintiff does not allege that Mr. Pacinelli also forgot to enter information into the logbook, he only alleges that Mr. Pacinelli *logged* samples with failed temperatures. (Doc. 30-C at 165:21–166:15.) Thus Plaintiff cannot establish that the work rules the two men violated were comparable in seriousness. *See Aramburu*, 112 F.3d at 1404.

Plaintiff attempts to rebut any argument that Mr. Pacinelli and Plaintiff were not similarly situated due to their differing disciplinary histories by asserting that Defendant violated provisions of the CBA in disciplining Plaintiff. (*See* Doc. 31 ¶¶ 3–4, 8–13.) Plaintiff contends all of the write-ups in his disciplinary history except for three were "invalid according provisions [sic] of the grievance process in accordance to the Union Contract." (*See id.*) Plaintiff does not explain, however, which of the write-ups were invalid or how Defendant violated the provisions of the CBA. Moreover, he does not attempt to establish whether he properly disputed any of his alleged

grievances within the strictures of the CBA or whether it is proper to raise the issues now in this forum. *See* CBA at 26, Article 36(I) (Grievance Procedure), available at https://abcwua.legistar.com/View.ashx?M=F&ID=2627285&GUID=0D912F65-522F-404A-8DFC-2775DEBFD02C ("Failure to submit a grievance within ten (10) days following the discovery of the act or the condition which gave rise to the grievance, will constitute forfeiture of the right to file."). While "an individual employee may bring suit against his employer for breach of a collective bargaining agreement[,] . . . [o]rdinarily . . . [he] is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163–65 (1983) (citations omitted). For these and the foregoing reasons, Plaintiff fails to demonstrate that he and Mr. Pacinelli were similarly situated in any of the above four incidents, thus he fails to establish the third part of the prima facie test under *McDonnell Douglas* with respect to Mr. Pacinelli.

### 4.    Ms. Judith Galvan

Ms. Galvan, a Hispanic employee, asserted that she has "had samples rejected . . . due to not being at proper temperature[,]" and Defendant took "no further action . . . other than" requiring Ms. Galvan "to repeat the process again[,] which is standard." (Doc. 31-6; *see also* Doc. 30-C at 162:1–166:15.) Plaintiff advances the same argument he did with response to Mr. Pacinelli's water samples, and it fails for the same reason: Plaintiff and Ms. Galvan are not similarly situated, because their conduct was different. There is no evidence that Ms. Galvan forgot to enter information into the logbook in addition to having failed temperatures. And like Mr. Armijo, Ms. Galvan is also Hispanic, so Plaintiff cannot show here that a "similarly situated *non-minority* employee[ was] treated differently." *See Aramburu*, 112 F.3d at 1403 (emphasis added).

Consequently, Plaintiff fails to establish the third part of the prima facie test under *McDonnell Douglas* with respect to Ms. Galvan.

### 5.   Ms. Barbara Gastian

Plaintiff argues that Defendant's alleged failure to discipline Ms. Gastian after her automobile accident is an example of disparate treatment. Plaintiff does not, however, demonstrate that he and Ms. Gastian were similarly situated: Ms. Gastian was a division manager, Plaintiff was not. It is unlikely, then, that they dealt with the same supervisor or shared "the same standards governing performance evaluation . . . ." *See Aramburu*, 112 F.3d at 1404 (quotation and internal citation omitted). Plaintiff does not present evidence to compare his driving history with Ms. Gastian's driving history. (*See* Doc. 31.) More importantly, Plaintiff has no knowledge of whether and how Defendant disciplined Ms. Gastian. (Docs. 30-C at 379:20–380:15; 30 ¶ 59; 31 ¶ 59.) He fails, therefore, to establish the third part of the prima facie test under *McDonnell Douglas* with respect to Ms. Gastian.

### B.   Plaintiff fails to show that Defendant's proffered nondiscriminatory reasons are pretextual.

If Plaintiff had established a prima facie case of disparate treatment, Defendant would need to "articulate, and support with some evidence, a legitimate, nondiscriminatory reason for" its treatment and termination of Plaintiff. *See Aramburu*, 112 F.3d at 1403 (citations omitted); *see also Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006). If Defendant shows "a facially nondiscriminatory reason" for disciplining and terminating Plaintiff, the burden shifts back to Plaintiff to offer "evidence that the defendant's proffered reason for the employment decision was pretextual—i.e., unworthy of belief . . . ." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation and citation omitted)).

The record contains evidence that Plaintiff was disciplined and ultimately terminated for engaging in conduct that was against Defendant's rules and regulations as well as the Last Chance Agreement. Plaintiff admitted much of the conduct that formed the basis for his write-ups and his termination. (*See* Doc. 30-C at 11:19–13:25, 46:18–52:4, 56:19–21, 131:17–136:9, 148:16–21, 262:1–265:14, 337:17–338:1, 368:1–23.) Plaintiff specifically disputes only three disciplinary incidents of the 30 incidents Defendant submitted. (*See* Doc. 30-A-1; *see also* Doc. 30-C at 56:22–57:25, 186:6–9, 211:15–23.) Plaintiff does not argue that any of the disciplinary write-ups were for conduct that was *not* against Defendant's rules or regulations. By showing it disciplined and terminated Plaintiff for conduct that violated its rules and regulations, Defendant has met its burden to show a "legitimate and nondiscriminatory" reason for its actions. *See Aramburu*, 112 F.3d at 1303; *see also Kendrick*, 220 F.3d at 1230.

The burden thus shifts to Plaintiff to demonstrate that Defendant's reason was pretextual. *See Kendrick*, 220 F.3d at 1230.

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false, *see*, *e.g.*, *Cole*[ *v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1380–81 (10th Cir. 1994)] (finding that evidence supporting the conclusion that the defendant's reason for the nonrenewal of plaintiff's employment contract was false was sufficient for plaintiff to survive summary judgment); (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, *see*, *e.g.*, *Mohammed*[ *v. Callaway*, 698 F.2d 395, 400–01 (10th Cir. 1983)] (finding that departure from employment criteria set out in job announcement so as to disadvantage minority employee seeking promotion was probative of discrimination); or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Id.*

Plaintiff's brief on this topic is poorly developed, but from a generous reading, it appears Plaintiff presents two arguments to show pretext: (1) Defendant's alleged violations of the CBA;

and (2) Defendant's excessive discipline of Plaintiff. (*See* Doc. 31 at 11–12.) Plaintiff fails, however, to meet his burden to show pretext using either argument. Regarding Plaintiff's allegations that Defendant violated the CBA, the Court explained above why this argument fails. *See* Section IV(A)(3)(e). Plaintiff's bare allegations, without more, that Defendant's actions violated the CBA are not enough to show pretext.

Plaintiff next argues Defendant engaged in a "pattern and practice" of excessive discipline against Plaintiff in order "to justify the actions taken against" him. (Doc. 31 at 11.) In other words, Plaintiff argues that the very act of disciplining Plaintiff—for conduct Plaintiff admits he engaged in and does not dispute was against the rules—was evidence of discrimination. Yet Plaintiff offers no evidence to support his theory. *See Baltazar v. Shinseki*, 485 F. App'x 941, 947 (10th Cir. 2012) (finding plaintiff failed to show pretext where she alleged her discharge was discriminatory and based on her national origin but "failed . . . to support these assertions with any record evidence and . . . wholly failed to show that [the supervisor who terminated her] knew reports of her deficient performance were fabricated or inaccurate"). When pressed about specific evidence of national origin discrimination during his deposition, Plaintiff pointed to poor treatment from Mr. Kelly, who refused to take Plaintiff to a PFT test, got mad at Plaintiff for cancelling the PFT test, asked Plaintiff what he was doing at his desk without asking other employees what they were doing, did not help Plaintiff close a manhole, "mad-dogged" Plaintiff with his eyes, and spoke rudely to him. (Doc. 30-C at 245:3–24, 368:1–369:2, 370:1–22.) Plaintiff's testimony, without more, "does not support the inference that [Kelly] discriminated against [Plaintiff] on the basis of his ancestry." *Aramburu*, 112 F.3d at 1405. "The general rule that [a court is to] draw inferences in favor of the party opposing summary judgment does not permit [the Court] to presume in this case that" Mr. Kelly's treatment of Plaintiff was related to his national origin, nor that Mr. Kelly treated similarly

situated non-Hispanic employees differently. *See id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887–89 (1990) ("explaining that even on summary judgment specific facts necessary to plaintiffs' standing could not be presumed from general language of affidavit which failed to specify which portions of land out of a large tract plaintiffs actually used where use of only certain tracts afforded standing")). In fact, Plaintiff's own testimony demonstrates that on at least one of these occasions, Mr. Kelly treated other Hispanic employees the same way he treated the non-minority employees. (*See* Docs. 30 ¶ 46 ("Mr. Salazar claims Mr. Kelly discriminated against him based on his race by asking him what he was working on, but not similarly asking the other monitoring technicians nearby—two of three of whom were also Hispanic." (citing Doc. 30-C at 245:3–246:11)); 31 ¶ 46.) *See also Aramburu*, 112 F.3d at 1406 ("unfavorable treatment of Aramburu does not support an inference of improper animus when other minorities are accorded the same treatment as the non-minority employees") (citing *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) ("stating when making comparisons with other employees a plaintiff must account for nondiscriminatory reasons for differential treatment")). "An animus not related to [Plaintiff's] ancestry, such as a personality conflict with [Mr. Kelly], is not evidence of improper discrimination." *Aramburu*, 112 F.3d at 1406 (citing *Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 247–48 (10th Cir. 1993) ("stating that Title VII does not protect against adverse employment decisions made on such factors as favoritism or mistake"); *Parker v. Hous. Auth. of Kansas City, Kan.*, No. 92-3136, 996 F.2d 311, 1993 WL 207441, at *4 (10th Cir. June 9, 1993) ("stating personality conflicts not covered")).

Plaintiff fails to dispute Defendant's facts to show there is any issue for trial. *See Applied Genetics Int'l, Inc.*, 912 F.2d at 1241. Plaintiff may not simply "rest on mere allegations[,]"*Anderson*, 477 U.S. at 25, he must offer evidence that Defendant's reason for

disciplining or terminating him was pretextual. Plaintiff fails to meet this burden, as his "evidence does not even minimally show that similarly situated non-minority employees were treated differently." *See Aramburu*, 112 F.3d at 1406. Accordingly, the Court will grant Defendant's motion on this issue and dismiss Plaintiff's claims for national origin discrimination pursuant to Title VII of the Civil Rights of 1964 and the New Mexico Human Rights Act.

## V.      Discussion on Count II: ADA Discrimination

Plaintiff asserts that Defendant violated the ADA, 42 U.S.C. § 12101 *et seq.*, by harassing and discriminating against him on the basis of his diabetes and back and shoulder injuries. Plaintiff also asserts in Count II of his Complaint that "[a]s a result of the systematic discriminatory policies of the Defendants, the Plaintiff has suffered disability discrimination and loss of wages and benefits." (Compl. ¶ 16.)[25] Defendant again contends Plaintiff was disciplined and discharged due to his violation of work rules and regulations and the Last Chance Agreement. (*See* Doc. 30.)

Plaintiff has not shown that any of Defendant's policies were discriminatory on their face, nor has he demonstrated direct evidence of discrimination on the part of his supervisors. *See, e.g.*, *West v. N.M. Taxation & Revenue Dep't*, 757 F. Supp. 2d 1065, 1096 (D.N.M. 2010) ("Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.") (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007) (internal quotation and citations omitted)); *Ramsey v. City & Cty. of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990) (discussing direct versus indirect or circumstantial evidence of discrimination based on gender). "Where, as here, an ADA plaintiff seeks to proceed to trial exclusively on the basis of circumstantial evidence of discrimination," the Tenth Circuit has "held that 'the analytical framework first articulated in' *McDonnell Douglas* in the context of Title VII claims controls [the

---

[25] The Court cites here to the second paragraph numbered 16. (*See* Compl.)

court's] analysis." *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1217 (quoting *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (internal citations omitted)). "Accordingly, the plaintiff must first establish a prima facie case of discrimination, showing a genuine issue of material fact exists on each of three points: '(1) [he] is a disabled person as defined by the ADA; (2) [he] is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) [his] employer discriminated against [him] because of [his] disability.'" *Id.* (quoting *MacKenzie*, 414 F.3d at 1274 (internal citation omitted)). "If the plaintiff establishes a prima facie case, 'the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. Should the defendant articulate a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether defendant's reason for the discharge is pretextual.'" *Id.* (citing *MacKenzie*, 414 F.3d at 1274 (internal citation omitted)).

Plaintiff relies on the same argument he advanced for his claims of national origin discrimination—that "Defendant began a campaign to marginalize the Plaintiff and subject him to arbitrary disciplinary actions to justify a later termination." (Doc. 31 at 13.) Plaintiff contends "some of the 'disciplinary' elements of the 'Last Chance' agreement were a sham to lead to the Plaintiff's eventual termination." (*Id.* (citing Doc. 31 ¶¶ 3–8).) The paragraphs Plaintiff cites to involve Plaintiff's contentions that Defendant violated the CBA and treated him differently than the unidentified person and Mr. Armijo. (*See* Doc. 31 ¶¶ 3–8.) The Court has previously explained why Plaintiff's arguments regarding these issues fail to establish an inference of discrimination. *See* Section IV. Accordingly, Plaintiff fails to establish a prima facie case of disability discrimination.

Even if Plaintiff had managed to establish a prima facie case of disability discrimination, Defendant's proffered reason for the termination (Plaintiff's failure to follow the rules and regulations) is a legitimate, nondiscriminatory explanation for its actions. *See West*, 757 F. Supp. 2d at 1100. Plaintiff must then "establish a genuine question of material fact" to show that Defendant's "explanation is pretextual." *Id.* "To establish a genuine issue of material fact as to pretext, a plaintiff must demonstrate that the Defendant's 'proffered non-discriminatory reason is unworthy of belief.'" *Id.* (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (internal quotation omitted, alterations in original)). Plaintiff has come forward with no additional allegations to support a finding that Defendant's reason is weak, implausible, inconsistent, or unworthy of belief. *See id.*; *see also Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004).

Plaintiff cites no specific instances of allegedly discriminatory incidents in the argument section of his Response, but he mentioned several incidents during his deposition that he believes show discriminatory animus. First, he alleges Mr. Kelly discriminated against him based on his disabilities by asking him how his diabetes was doing and by refusing to let him stay in the air-conditioned vehicle on a hot day. (Doc. 30-C at 239:2–242:3, 388:10–389:5.) Second, he contends Mr. Daily discriminated against him by disciplining him for an unauthorized absence and then keeping the disciplinary report in his file past an alleged CBA-mandated six month limit. (*Id.* at 215:13–220:4.) Finally, he asserts Mr. Reeder discriminated against him due to his disabilities by asking him about Plaintiff's personal truck after he had been in an accident, by saying "F you" to Plaintiff, and by accusing him of insubordination. (*Id.* at 192:2–193:24, 204:19–205:22.)

Plaintiff does not connect the dots to show how these incidents provide circumstantial evidence of disability discrimination or demonstrate that Defendant's reason for terminating

Plaintiff is pretextual, and the Court declines to manufacture any such connection. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001) (noting that a court "may not second guess the business judgment of the employer[,] . . . [and t]he relevant question is whether the reason articulated by the employer was the real reason for the challenged action") (citation omitted). Neither Plaintiff's deposition testimony nor the scant argument in his Response provide any "affirmative evidence that disability was a determining factor in [Defendant's] decision." *Butler v. City of Prairie Village*, 172 F.3d 736, 748 (10th Cir. 1999) (quotation and internal citation omitted). And Plaintiff "has provided no evidence that [Defendant's] stated reason [for terminating Plaintiff] was not the real reason, regardless of whether it was a good reason." *McCully v. Am. Airlines, Inc.*, 695 F. Supp. 2d 1225, 1244 (N.D. Okla.), *aff'd*, 406 F. App'x 260 (10th Cir. 2010); *see also Nelson v. Williams Field Servs. Co.*, 216 F.3d 1088, at \*4 (10th Cir. 2000) (dismissing ADA claim where employee admitted his conduct violated the Return-to-Work Agreement he had signed with his employer and failed to show this reason was pretextual). "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997) (citation omitted)). The Court will grant Defendant's motion on this issue and dismiss Plaintiff's claim for disability discrimination.

## VI.   Discussion on Count III: Wrongful Termination—Violation of Contract

Plaintiff asserts a claim for wrongful termination. Again, Plaintiff's response to Defendant's motion does little to elucidate his Complaint, but it would seem he has two theories for this claim. First, Plaintiff alleges in his Response that "[t]he action of the Defendant in not providing a safe environment" on the day Mr. Kelly refused to allow Plaintiff to sit in an air-conditioned vehicle, which allegedly "result[ed] in the Plaintiff suffering from heat-stroke[,] . . .

was a violation of their contractual obligations." (Doc. 31 at 14.) Second, Plaintiff argues it was a violation of the Last Chance Agreement for Defendant to end his employment as a "Disciplinary Termination," rather than as a "Voluntary Resignation," as provided for in the contract. (*See id.*; Compl. ¶¶ 18–19; *see also* Docs. 30 ¶¶ 12, 20; 30-E; 30-F; 31 ¶¶ 12, 20.) Plaintiff contends he has "suffered emotional distress and embarrassment" as a result of his termination. (*Id.*)

Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages." *Res. Assocs. Grant Writing & Evaluation Servs., Inc. v. Southampton Union Free Sch. Dist.*, No. CIV 15-1132 JB/SCY, 2016 WL 3996383, at *33 (D.N.M. June 15, 2016) (quoting *Abreu v. N.M. Children, Youth & Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011) (citing *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1196 (N.M. 1995), *overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 301 P.3d 387, 392–93 (N.M. 2013))). Defendant makes two arguments in support of its Motion with respect to Plaintiff's breach of contract claim: first, Defendant argues Mr. Kelly did not breach the Last Chance Agreement by not allowing Plaintiff to sit in the air-conditioned vehicle; and second, even if Defendant did breach the contract by using the term "disciplinary termination" instead of "voluntary resignation," Defendant contends Plaintiff has failed to establish any compensable damages. The Court agrees.

### A.   Defendant did not breach a contract when Mr. Kelly did not allow Plaintiff to sit inside of an air-conditioned vehicle.

Plaintiff alleges that Mr. Kelly's actions in not allowing him to sit inside of an air-conditioned vehicle on a hot day, which allegedly resulted in Plaintiff suffering from heat exhaustion, was a breach of contract. (Doc. 31 at 14; *see also* Doc. 31-4.) Plaintiff cites two cases in support of his argument, but neither involve breach of contract claims and are, therefore,

inapplicable. (*Id.* (citing *Koenig v. Perez*, 726 P.2d 341 (N.M. 1986) (discussing a claim for negligence); *Arvas v. Feather's Jewelers*, 582 P.2d 1302 (N.M. Ct. App. 1978) (discussing a claim for negligence)). Plaintiff did not include a claim for negligence in his Complaint, and the time for Plaintiff to amend his Complaint has passed. (*See* Doc. 13 at 2.) To the extent his Response may be construed as a motion to amend to add a claim for negligence, it is denied.

Plaintiff fails to otherwise demonstrate how Mr. Kelly's actions breached the Last Chance Agreement. Consequently, Plaintiff fails to "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof." *Applied Genetics Int'l, Inc.*, 912 F.2d at 1241 (citing *Celotex*, 477 U.S. at 324).

### B.    Plaintiff fails to establish damages.

Accepting as true that Defendant's use of the term "disciplinary termination" was a breach of contract, Plaintiff would still need to prove he suffered damages. *See Res. Assocs. Grant Writing & Evaluation Servs., Inc.*, 2016 WL 3996383, at *33. Plaintiff claims he has suffered "emotional distress and embarrassment" as a result of Defendant's breach of the parties' contract. (Doc. 31 at 14.) Defendant contends the only "possible damage he could have suffered would have related to having a 'termination' on his employment record."[26] (Doc. 30 at 23.) As Plaintiff has applied for only two positions since he left the Water Authority, and the "termination" notation had nothing to do with the fact that he did not obtain and/or remain employed with either of those positions, Defendant argues Plaintiff has not suffered any damages. (*Id.*) The Court agrees.

---

[26] Defendant maintains that because Plaintiff admits he violated the Last Chance Agreement, his employment was "properly ended, [and] he cannot claim to have been damaged as a result of losing the benefits of further employment with the Water Authority." (Doc. 30 at 23.) Plaintiff does not respond to this argument, and the Court finds he has waived any claim to damages for lost wages or other benefits of further employment.

Case 1:16-cv-00120-RB-KK   Document 35   Filed 01/17/17   Page 39 of 41

"New Mexico allows recovery for stand alone emotional distress only in limited circumstances, including intentional infliction of emotional distress, in connection with certain intentional economic torts, and in contractual situations where the specialized nature of the contract naturally contemplated that reasonable care would be taken to avoid the infliction of severe emotional distress." *Akutagawa v. Laflin, Pick & Heer, P.A.*, 126 P.3d 1138, 1143 (N.M. Ct. App. 2005) (citing *Jaynes v. Strong-Thorne Mortuary, Inc.*, 54 P.2d 45, 50 (N.M. 1997) ("stating that '[i]ntentional infliction of emotional distress arises when a defendant intentionally or recklessly causes severe emotional distress through extreme and outrageous conduct'") (internal citations omitted); *Flores v. Baca*, 117 871 P.2d 962, 967 (N.M. 1994) ("stating that courts permit recovery for mental anguish caused by breach of contract in cases in which the purpose of the contract would be frustrated unless such damages were awarded, for example in a contract for funeral services")). Plaintiff points to no language from the Last Chance Agreement or to circumstances surrounding the parties' signing of the contract to show it was such a specialized contract.

Even if Plaintiff could show that recovery for emotional distress was appropriate, his claim would fail "because there [is] insufficient evidence to" demonstrate "the emotional distress experienced by [Plaintiff] was severe." *Trujillo v. N. Rio Arriba Elec. Coop, Inc.*, 41 P.3d 333, 343 (N.M. 2002) (citations omitted). "To recover emotional distress damages, those damages must be 'severe.'" *Id.* (quotation omitted)). "Severe emotional distress means that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances.'" *Id.* (quotation omitted)). "In other words, the distress must be 'so severe that no reasonable [person] could be expected to endure it.'" *Id.* (quoting Restatement (Second) of Torts § 46 cmt. j).

Plaintiff alleges in his Complaint he "has suffered anger, humiliation, emotional upset, stress, and other and similar emotional and physical symptoms as a result" of Defendant's harassment and discrimination of Plaintiff, but he fails to provide evidence to demonstrate the extent of his emotional distress. (Compl. ¶ 13.)[27] He testified in his deposition that he has spoken with several people about his emotional harm. (Doc. 30-C at 137:16–25, 296:1–18.) He also testified the stress caused his diabetes to go "out of control" while he was still working with the Water Authority. (*Id.* at 136:5–9.) Yet Plaintiff provides no evidence he has received psychological counseling, taken any medications for emotional harm, or experienced any specific physical symptoms due to his emotional distress. *See Trujillo*, 41 P.3d at 343 (finding plaintiff failed to show severe emotional distress where he "felt 'lousy' and depressed[,]" was prescribed Prozac, slept long hours, and had erratic eating habits); *see also*, *e.g.*, *Nkemakolam v. St. John's Military Sch.*, 994 F. Supp. 2d 1193, 1198 (D. Kan. 2014) (noting the Kansas Supreme Court has opined that "the absence of psychiatric or medical treatment, including medication, weighs against a finding of extreme emotional distress") (quotation and internal citation omitted)).

"'[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach.'" *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.*, 738 P.2d 513, 514 (N.M. 1987) (quoting *Bd. of Educ. v. Jennings*, 701 P.2d 361, 364 (N.M. 1985) (internal quotation omitted)). If Plaintiff could have shown the "termination" notation cost him later employment opportunities, perhaps he would be able to show damages. Plaintiff admitted, however, that he decided not to pursue one position because he was unable to satisfy certain medical requirements, and he quit the other position because it was hard on his back. (Doc.

---

[27] The Court cites here to the second paragraph 13 in Plaintiff's Complaint.

40

30-C at 318:4–319:20.) The Court finds Plaintiff has failed to show a genuine issue of fact regarding damages he sustained as a result of any breach of the Last Chance Agreement. The Court will grant Defendant's motion on Plaintiff's breach of contract claim.

**VII.    Conclusion**

Plaintiff has failed to demonstrate the existence of a genuine issue of fact on any of his claims. The Court will grant Defendant's motion for summary judgment in full and dismiss Plaintiff's complaint.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 30) is **GRANTED** and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.


_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**